UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

NORMAN C. MAYES,                          )
                                          )
                    Plaintiff,            )
                                          )
v.                                        )          No.:   3:05-CV-478
                                          )                 (VARLAN/SHIRLEY)
ENVIRONMENTAL PROTECTION                  )
AGENCY, *et al.*,                         )
                                          )
                    Defendants.           )

## MEMORANDUM OPINION

This civil action is before the Court on plaintiff Norman Mayes's ("Plaintiff") Motion

for Judgment on the Pleadings [Doc. 35] and defendant Environmental Protection Agency's

("EPA") and defendant Stephen L. Johnson's (collectively, "Defendants") Cross-Motion for

Judgment on the Pleadings. [Doc. 36.]  Each of the parties has responded to the opposing

motion [Docs. 38, 39], and the Court heard argument on the motions on June 26, 2007.  At

the close of the hearing, the Court took the matter under advisement.  After carefully

considering the pending motions, related pleadings, the record, and the arguments offered

during the hearing, the Court rules on the motions as set forth herein.

## I.      Procedural History

A brief description of the procedural history of this case is worth noting to put the

following issues in context.  Plaintiff sought judicial review of an Environmental Appeals

Board ("EAB") final order affirming an administrative law judge's decision finding Plaintiff

liable for violations of the Resource Conservation and Recovery Act ("RCRA") with respect

to certain underground storage tanks ("USTs") on his property. Plaintiff filed a petition for review with the United States Court of Appeals for the District of Columbia Circuit on May 31, 2005. The case was ultimately transferred to this Court from the D.C. Circuit on October 14, 2005. [Doc. 1.] Plaintiff was then ordered to file a complaint as required by Fed. R. Civ. P. 7(a). [Doc. 4.] The complaint was filed February 20, 2006 [Doc. 7] asserting claims against Defendants, as well as the Tennessee Department of Environment and Conservation ("TDEC") and two agents of TDEC, Ms. Roach and Mr. Hyers. The claims against TDEC, Ms. Roach, and Mr. Hyers were dismissed by this Court's Order [Doc. 25] dated September 20, 2006, as were the Fourth Amendment and § 1983 claims against Defendants. On November 9, 2006, Plaintiff filed an amended complaint [Doc. 28] more fully setting forth the basis of his appeal, to which Defendants filed an answer [Doc. 29] on November 21, 2006. The instant motions followed, which are now ripe for adjudication.

## II.    Relevant Facts

The following relevant background facts are not in dispute, unless otherwise noted. Plaintiff and his wife reside on an approximately eighty-acre tract of land (the "Property") in Powell, Tennessee. Plaintiff acquired the Property from his father, and in approximately 1951 an air strip was placed on the Property. Plaintiff contends that the Property is also used as a farm, with hay as its only current crop, which is harvested twice a year. At some point in time, three USTs were placed on the Property, where they remained until July 2001. The three tanks were designated AV#1 (a 1,000 gallon tank), AV#2 (a 1,000 gallon tank), and AV#3 (a 3,000 gallon tank). All three of the tanks, to a varying extent, contained

2

commercial airplane fuel, though there is a dispute over exactly how tanks AV#1 and AV#2 were used and whether those tanks fell under RCRA's farm exemption.

On April 8, 1986, Plaintiff registered tank AV#3 with the Tennessee Department of Health and Environment. [TR Vol. 1A at Tab 13-4.][1] The 1986 notification indicated that the tank was approximately four years old. [*Id.*] On February 1, 1990, Plaintiff filed another registration form on a 3,000 gallon tank, presumably tank AV#3, but this form indicated the tank was approximately ten years old. [*Id.* at Tab 13-5.] On March 17, 2000, TDEC conducted an inspection of the Property, and the inspector observed that there were two unregistered tanks on the property, tanks AV#1 and AV#2. [*Id.* at Tab 13-8.] Plaintiff told the inspector that tanks AV#1 and AV#2 were farm tanks used to fuel his tractor for farm use, and thus did not have to be registered. [*Id.*] During the March 17, 2000, inspection, it was determined that tank AV#1 contained thirty-five inches of product and zero inches of water, tank AV#2 contained twenty-two inches of product and five inches of water, and tank AV#3 contained two inches of product and six inches of water. [*Id.* at Tab 13-9.]

On March 21, 2000, TDEC conducted a follow-up inspection. [*Id.* at Tab 13-10.] During the follow-up inspection, the TDEC inspector observed that tanks AV#1 and AV#2 had tags located near them, labeled "AVGAS 100" and "AVIA 100." [*Id.*] The inspectors

---

[1]The record on appeal consists of nine binders labeled 1A through 8 (including a volume 1B), with each binder containing several numbered tabs, and some of the numbered tabs being further subdivided into sub-tabs. The documents are not bates stamped, so the Court will preface a citation to the record with TR and reference the volume, the tab, and, as appropriate, the sub-tab.

3

also observed that there was a barn on the property, as well as at least two tractors, though the inspector did not observe any evidence of frequent agricultural use. [*Id.*]

Later that same year, TDEC sent Plaintiff a notice stating that Plaintiff had not paid his UST fee and assessing a 5% late fee. [*Id.* at Tab 13-12.] Payment was due on July 31, 2000, but the notice does not appear to be dated. [*Id.*] In response, Plaintiff sent TDEC a letter, dated August 1, 2000, stating that the tank in question, AV#3, contained only water and had not been in use for two years or longer, arguing that Plaintiff should not have to pay a fee on a tank not in use. [*Id.* at Tab 13-13.] In response, TDEC sent Plaintiff a letter dated August 28, 2000, indicating that because the tank in question had not been properly closed or removed prior to July 1, 2000, Plaintiff had incurred the fee, whether the tank was in use or temporarily out of use. [*Id.* at Tab 13-14.] On September 13, 2000, TDEC sent Plaintiff a third and final notice regarding his unpaid UST fee. [*Id.* at Tab 13-15.] The letter warned Plaintiff of the possible penalties and fines he could incur if he failed to pay the fee. [*Id.*]

TDEC next received a letter dated September 25, 2000, allegedly from Plaintiff, attached to which was a form indicating that tank AV#3 was now being used to store an agricultural herbicide rather than aviation fuel. [*Id.* at Tab 13-16.] Plaintiff contends that he never sent the letter and does not know where it came from. As a result of the letter dated September 25, 2000, and attached change of use form, on October 3, 2000, TDEC updated the status of the tank, cancelled the unpaid invoice, and removed the unpaid fee from Plaintiff's account. [*Id.* at Tab 13-18.]

4

TDEC next sent Plaintiff a letter dated October 17, 2000, entitled Notice of Violation. [*Id.* at Tab 13-19.] The letter informed Plaintiff that he had failed to properly take tank AV#3 out of service and included an application for permanent closure of an UST for Plaintiff to complete and return to TDEC. [*Id.*]

On or around October 23, 2000, a TDEC employee, Mr. Ryan Hyers, documented a conversation he had allegedly had with Plaintiff earlier that day. [*Id.* at Tab 13-20.] The report indicated that Plaintiff called Mr. Hyers regarding the October 17, 2000, Notice of Violation, that Plaintiff had stated that tank AV#3 was now being used to hold a non-regulated herbicide instead of airline fuel, and that he had filed the appropriate change of use forms. [*Id.*] On October 24, 2007, Mr. Hyers called Plaintiff to inform him that a site assessment, including the taking of samples around and below the tank, would be necessary according to "Rule 1200-1-15-.07(2)(c)." [*Id.*] Plaintiff allegedly told Mr. Hyers "you can take me to court if you want and let's see how strong your damn regulations are." [*Id.*] Plaintiff also asked to speak to Mr. Hyers's supervisor. [*Id.*] Mr. Hyers's supervisor, Steve Wilson, also documented his alleged conversation of October 24, 2000 with Plaintiff. [*Id.* at Tab 13-21.] Mr. Wilson's report indicates that Plaintiff did not believe it was necessary to have the site sampled and that he was being threatened and treated unfairly, but finally indicated that he would fill out the paperwork as best he could. [*Id.*]

On November 2, 2000, the EPA sent Plaintiff a request for information under RCRA, asking Plaintiff to provide information about any USTs on the Property within fifteen days of receipt of the request. [*Id.* at Tab 13-22.] On November 6, 2000, the EPA sent Plaintiff

a letter indicating that it would be performing "a compliance inspection of the underground storage tank facility" at the Property sometime during the week of November 27, 2000. [*Id.* at Tab 13-23.] On November 20, 2007, the EPA sent Plaintiff a letter alleging to memorialize telephone conversations between the EPA, Plaintiff, and Plaintiff's contractor, Mr. Jim Miller. [*Id.* at Tab 13-24.] The November 20, 2007, letter indicated that Plaintiff and Mr. Miller had agreed to schedule the inspection of the USTs at the Property for November 28, 2000, at 2:00 P.M.

On November 28, 2000, Plaintiff submitted to the EPA the information requested in the EPA's letter dated November 2, 2000. [*Id.* at Tab 13-25.] The documents submitted set forth that all three tanks had at one time contained aviation fuel, that tank AV#3 was temporarily closed, and that of tanks AV#1 and #2, one was out of use and one was used for agricultural use. [*Id.*] The documents also included an application for closure of the tanks, as well as an affidavit signed by Plaintiff indicating that no herbicides had ever been stored in the tanks in question. [*Id.*]

Also on November 28, 2000, TDEC and the EPA conducted a site inspection of the Property. [*Id.* at Tabs 13-27, 13-28, 13-29.] During this inspection, government agents inspected and took samples from the tanks in question. [*Id.* at Tabs 13-28, 13-29.] It was determined that tank AV#1 contained one and three-fourths inches of product and twenty-five and one-fourth inches of water, tank AV#2 contained thirty-one and five-eights inches of product and two and three-eighths inches of water, and tank AV#3 contained five-eights inches of product and seven and three-eights inches of water. [*Id.*] Government agents also

inspected various outbuildings and equipment on the Property, looking for evidence of the Property's farm use. [*Id.*] The inspection of the fuel tanks of three tractors on the Property revealed that none of the tractors had aviation fuel in their fuel tanks. [*Id.*] There is a dispute over whether Plaintiff had prior knowledge of the scope of the search and whether Plaintiff consented to the search of the various outbuildings and equipment. On July 9, 2001, the three tanks were excavated and removed under TDEC supervision. [*Id.* at Tab 13-35.]

On March 25, 2002, the EPA issued an Administrative Complaint and Compliance Order alleging that: Plaintiff had failed to properly notify either TDEC or the EPA regarding tanks AV#1 and AV#2 in violation of 42 U.S.C. § 6991b and 40 C.F.R. § 280.22; had failed to comply with the UST release detection requirements with respect to tanks AV#1, AV#2, and AV#3 in violation of 42 U.S.C. § 6991b and 40 C.F.R. § 280.40; and that Plaintiff had failed to properly upgrade or permanently close tanks AV#1 and AV#2 before the December 22, 1998 deadline and failed to permanently close and assess the site of AV#3 within twelve months of its temporary closure, all in violation of 42 U.S.C. § 6991b and 40 C.F.R. § 280.70(c).[2] [TR Vol. 1A at Tab 1.] On April 20, 2002, Plaintiff filed his answer to the complaint, denying that he was in violation of federal law and requesting a hearing on the matter. [*Id.* at Tab 2.] On June 5, 2002, the matter was assigned to Administrative Law Judge Barbara A. Gunning ("ALJ"). [*Id.* at Tab 5.]

---

[2]The Complaint was later amended to reduce the penalty amount to $66,666.00, but the substance of the Complaint was otherwise unchanged. [TR Vol. 4 at Tab 44 at p. 13.]

On May 8, 2003, Plaintiff filed a motion to suppress all evidence obtained from the November 28, 2000 search of the Property, arguing that the warrantless search was without consent and unconstitutional. [TR Vol. 3 at Tab 27.]  On June 3, 2003, the ALJ denied Plaintiff's motion to suppress, finding that Plaintiff had consented to the search. [*Id.* at Tab 41.]  On June 4, 2003, Plaintiff filed a motion to reconsider, asking the ALJ to reconsider her ruling on the motion to suppress. [*Id.* at Tab 43.]  On June 6, 2003, the ALJ denied Plaintiff's motion to reconsider, but ruled that the issue of the legality of the search could be revisited at the hearing scheduled to begin June 9, 2003. [TR Vol 4 at Tab 44 at pp. 6-7.]

From June 9, 2003 through June 13, 2003 the ALJ conducted a hearing on the alleged violations. [TR Vols. 4, 5, 6, 7.]  On February 27, 2004, the ALJ issued her Initial Decision, making the following conclusions of law:

1.      [Plaintiff] is a "person" as defined by 40 C.F.R. § 280.12.

2.      [Plaintiff] is an "owner" and "operator" of three "Underground Storage Tanks" as those terms are defined by 40 C.F.R. § 280.12.

3.      [Plaintiff] failed to prove that Tanks #1 and #2 were "farm tanks" as that term is defined in 40 C.F.R. § 280.12.

4.      The Underground Storage Tanks are an "existing tank system" as that term is defined by 40 C.F.R. § 280.12.

5.      [Plaintiff's] three USTs contained aviation grade petroleum which is a "regulated substance" pursuant to 40 C.F.R. § 280.12.

6.      [Defendant's] allegations against [Plaintiff] constitute "continuing violations" and are not barred by the otherwise

8

applicable five-year statute of limitations period. 28 U.S.C. § 2462.

7. [Plaintiff] has not demonstrated that the inspections conducted by [Defendant] were unlawful searches and seizures. [Defendant] has established that the November 28, 2000 inspection was consensual.

8. [Defendant] has the burdens of presentation and persuasion to establish the prima facie case against [Plaintiff]. [Plaintiff] has the burdens of presentation and persuasion for any affirmative defenses and exemptions stated in the regulations.

9. [Plaintiff] failed to prove that Tanks #1, #2, or #3 were "empty" as defined in 40 C.F.R. § 280.70(a).

10. [Plaintiff] failed to prove that Tank #3 had a "change-in-service" as that term is used in 40 C.F.R. § 280.71.

11. Tank #3 was never "temporarily closed" as that term is used in 40 C.F.R. § 280.70.

12. Tanks #1, #2, and #3 are subject to EPA jurisdiction as regulated USTs.

13. [Plaintiff] failed to submit the appropriate "notice" form for Tanks #1 and #2 within 30 days of bringing the tanks into use as required by 40 C.F.R. § 280.22.

14. [Plaintiff] failed to provide a method of release detection for Tanks #1, #2, and #3 by at least December 22, 1993 as required by 40 C.F.R. § 280.40.

15. [Plaintiff] failed to upgrade or, alternatively, close Tanks #1 and #2 by December 22, 1998 as required by 40 C.F.R. §§ 280.21 and 280.70.

16. [Plaintiff] failed to upgrade, or alternatively, close Tank #3 by December 22, 1998 as required by 40 C.F.R. §§ 280.21 and 280.70.

17.    The total civil penalty of $66,301 for [Plaintiff's] violations is authorized and in accordance with statutory penalty criteria in Section 9006(c) of RCRA, 42 U.S.C. § 6991e(c), and the applicable penalty policy issued under RCRA. *See* U.S. EPA Penalty guidance for Violations of UST Requirements; 40 C.F.R. § 22.27(b).

18.    The total civil penalty of $66,301 is appropriate and reasonable for [Plaintiff's] violations of the underground storage tank regulations in 40 C.F.R. §§ 280.12 - 280.72.

19.    [Plaintiff] is not eligible for or entitled to attorney's fees. 5 U.S.C. § 504; 40 C.F.R. Part 17.

[Tr. Vol. 8 at Tab 54 at pp. 50-52.]

On March 27, 2004, Plaintiff appealed the ALJ's Initial Decision. [Id. at Tab 55.] On March 3, 2005, the EAB issued its Final Decision and Order, affirming the ALJ's decision in all respects. [Tr. Vol 8 at Tab 64.]  The instant litigation followed.

## III.    Discussion

A.    <u>Standard of Review</u>

Plaintiff's appeal falls under the ambit of the Administrative Procedures Act ("APA").

The APA defines the scope of review as follows:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall –

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be –

10

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction; authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

Accordingly, this Court must review questions of law de novo; questions of agency action, such as the decision to exclude evidence, are reviewed for an abuse of discretion; and, as this matter constitutes a review of the record established below pursuant to 42 U.S.C. § 6991e(b), the Court must uphold the agency's decision if it is supported by substantial evidence. 5 U.S.C. § 706; *Kratt v. Garvey*, 342 F.3d 475, 480 (6th Cir. 2003) (de novo standard of review for questions of law); *Kentucky River Community Care, Inc. v. National Labor Relations Board*, 193 F.3d 444, 452 (6th Cir. 1999) (decision to exclude evidence reviewed for abuse of discretion). Substantial evidence is defined as "such relevant evidence

11

as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. National Labor Relations Board*, 305 U.S. 197, 229 (1938). In determining whether an agency's decision is supported by substantial evidence, the reviewing court cannot "re-weigh the evidence or substitute [its] judgment for that of the ALJ." *Gray v. SLC Coal Co.*, 176 F.3d 382, 387 (6th Cir. 1999). "Thus, as long as the ALJ's conclusion is supported by the evidence, [the Court] will not reverse, even if the facts permit an alternative conclusion." *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995). Finally, a court must pay particular deference when reviewing an agency's imposition of a penalty or other sanction because such action implicates an agency's technical expertise. *Newell Recycling Co., Inc. v. EPA*, 231 F.3d 204, 208 (5th Cir. 2000). Accordingly, an agency's penalty determination should not be reversed unless it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. *Id.*

Additionally, the Court notes that in interpreting statutes, the Court must follow the two-part test established in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). There, a unanimous Supreme Court explained how a court is to evaluate an agency's interpretation of a statute it administers. First, the court must determine "whether Congress has spoken directly to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43 (footnote omitted). *See also American Mining Congress v. United States EPA*, 824 F.2d 1177, 1182 (D.C. Cir. 1987) ("This inquiry focuses first on the language and structure of the

statute itself. If the answer is not yielded by the statute, then the court is to look to secondary indicia of intent, such as the measure's legislative history."). Second, in cases where Congress's intent is not clear or where "Congress has not directly addressed the precise question at issue . . .[,] the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843 (footnotes omitted).

     B.    <u>Issues Raised on Appeal</u>

    Plaintiff raises six major issues on appeal, with each major issue consisting of multiple sub-issues. The major issues raised include: whether the charged violations are barred by the statute of limitations; whether the various searches conducted by TDEC and EPA were constitutional; whether Defendants carried their burden of proof; whether the ALJ's credibility determination as to Plaintiff was appropriate; whether Plaintiff was in violation of the regulations at issue; and whether the penalty calculation was appropriate in this case. The Court will address each issue in turn, reserving the issue of whether Defendants carried their burden for last.

     C.    <u>Statute of Limitations</u>

    Plaintiff argues that the alleged violations of 40 C.F.R. § 280.22 and 40 C.F.R. § 280.40 are barred by the statute of limitations, and thus those charges should have been dismissed. Defendant disagrees, arguing that the violations at issue constituted continuing violations, thus tolling the statute of limitations. Alternatively, Defendant contends that the violations constituted a series of discrete violations that occurred from the initial date of violation through the date when the tanks were properly closed, and that the period of time

charged fell within the statute of limitations. The issue of whether the statute of limitations barred the complaint in this matter presents a question of law, and thus the Court reviews the issue *de novo*. *Tolbert v. State of Ohio Dep't of Transp.*, 172 F.3d 934, 940 (6th Cir. 1999).

RCRA does not establish its own statute of limitations, and thus the matter falls under the general five year statute of limitations established by 28 U.S.C. § 2462. *Harmon Industries Inc. v. Browner*, 19 F. Supp. 2d 988, 998 (W.D. Mo. 1998). Specifically, federal law provides that "[e]xcept as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued." 28 U.S.C. § 2462.

40 C.F.R. § 280.22 provides in pertinent part that:

> Any owner who brings an underground storage tank system into use after May 8, 1986, must within 30 days of bringing such tank into use, submit, in the form prescribed in appendix I of this part, a notice of existence of such tank system to the state or local agency or department designated in appendix II of this part to receive such notice

40 C.F.R. § 280.22(a). Additionally, 40 C.F.R. § 280.40 provides in pertinent part that owners of USTs must provide some method of release detection prior to a date certain, with the date varying depending upon when the tanks were established. 40 C.F.R. § 280.40. If the tanks were installed between 1980 and 1988, the regulation required that release detection be in place by December 22, 1993. [*Id.*]

14

The complaint alleges that Tanks AV#1 and AV#2 were in the ground when Defendant came to own the property in 1987. Thus, under the regulations, Plaintiff was required to have given notice of Tanks AV#1 and AV#2 within thirty days of that time. Accordingly, if Tanks AV#1 and AV#2 fell under the regulations, Plaintiff should have given notice sometime between January 31, 1987 (assuming a January 1, 1987 activation date of the tanks) and January 30, 1988 (assuming a December 31, 1987 activation date). The EPA filed its complaint March 25, 2002, some thirteen to fourteen years after the dates when notice should have been given. Similarly, at the latest, release detection devices on Tanks AV#1, AV#2, and AV#3 were required by December 22, 1993, approximately 8 years prior to the filing of the complaint. Thus, the charged violations fall outside the five year statute of limitations period and are accordingly time barred, unless some exception to the statute of limitations brings the charges inside the limitations period.

There are a number of legal theories which can work to salvage a claim that has otherwise run afoul of a statute of limitations. The first such theory discussed by the parties is the discovery rule. In describing the discovery rule, the D.C. Circuit has held that

> A claim normally accrues when the factual and legal prerequisites for filing suit are in place. While this appears to be a straightforward formulation, there may be complications: "The statutory period may begin either when the defendant commits his wrong or when substantial harm matures. This choice, unnecessary where the two events are simultaneous, becomes complex where considerable time intervenes; here the courts have generally looked to the substantive elements of the cause of action on which the suit is based." If the period always ran from the date of the wrong, actions by workers previously exposed to dangerous chemicals, for example, might be

15

time-barred when brought years later after the workers' injuries manifested themselves. For cases involving such latent injuries or injuries difficult to detect, courts have developed the "discovery rule. . . ." The "discovery rule" rests on the idea that plaintiffs cannot have a tenable claim for the recovery of damages unless and until they have been harmed. Damage claims in cases involving hidden injuries or illnesses therefore are viewed as not accruing until the harm becomes apparent. . . . Although use of the rule has not been restricted to personal injury actions, the rule has only been applied to remedial, civil claims.

*3M Co. v. Browner*, 17 F.3d 1453, 1460 (D.C. Cir. 1994) (citations omitted). The *3M Co.* court went on to rule that the discovery rule did not apply to the case at bar, holding that "an action, suit or proceeding to assess or impose a civil penalty must be commenced within five years of the date of the violation giving rise to the penalty." *Id.* at 1462; *see also United States v. Murphy Oil USA, Inc.*, 143 F. Supp. 2d 1054 (D. Wis. 2001) (rejecting the discovery rule in an environmental civil penalty case).

In the case at bar, as in *3M Co.*, there is no legal authority to support a finding that the claims accrued at any time other than the time of the violation. Thus, the discovery rule cannot serve to insulate the charges at issue from the statute of limitations. Thus, the Court must continue with its statute of limitations analysis and proceed to the next legal theory raised by the parties.

The next legal theory addressed by the Court is the series of discrete violations theory. In *Nat'l Parks Conservation Ass'n, Inc. v. Tennessee Valley Auth.*, 480 F.3d 410 (6th Cir. 2007), the Sixth Circuit described the theory of a series of discrete violations as follows:

16

> Courts have long distinguished continuing violations, which toll the applicable statutes of limitations, from repetitive discrete violations, which constitute independently actionable individual causes of action. For instance, in *Gandy*, we noted that each check based on a discriminatory method of calculating pay constitutes a separate violation of the Equal Pay Act, and we concluded that the plaintiff was entitled to a recovery based on any such checks received within the limitations period. We further recognized, "Although [the cause of action is] 'continuing in nature,' invocation of the continuing violations doctrine is not necessary since plaintiffs . . . are not attempting to file an otherwise untimely action and are not attempting collection of damages for conduct outside the limitations period."

*Nat'l Parks Conservation Ass'n, Inc.*, 480 F.3d at 417 (internal citations omitted). The Sixth Circuit went on to hold that failure to obtain a construction permit constitutes a series of discrete violations, with a new violation occurring with each day of non-compliance. *Id.* at 419.

When RCRA was enacted, it mandated the promulgation of "release detection, prevention, and correction regulations applicable to all owners and operators of underground storage tanks, as may be necessary to protect human health and the environment." 42 U.S.C. § 6991b(a). Thus, the overarching goal of the regulations at issue is to protect human health and the environment, a goal that could not be achieved if the regulations at issue did not create an ongoing duty to comply with the regulations. Additionally, the Court notes that at least one other court has held that regulations promulgated under RCRA create a continuing obligation. *Dydio v. Hesston Corp.*, 887 F. Supp. 1037, 1045 (D. Ill. 1995) ("past owners of USTs have continuing obligations to take corrective action following the confirmed

17

release of a regulated substance"). Additionally, another court has held that RCRA, as applied to the storage and disposal of hazardous waste, "imposes continuing obligations" and that the associated regulations "are not meant to reward long term repetitive violators of RCRA who escape getting caught within the five year statute of limitations." *Harmon Industries, Inc. v. Browner*, 19 F. Supp. 988, 998 (W.D. Mo. 1998).

Accordingly, the Court finds that the regulations at issue create a continuing obligation of compliance, with the initial date of non-compliance occurring on the date established by the regulations. To rule otherwise would defeat the purpose of RCRA and the regulations promulgated under it. Any other ruling would also reward attempts at concealing the existence of USTs from regulatory authorities, which would be at odds with the statute's stated spirit and purpose of protecting human health and the environment. In light of this ruling, the Court further finds that each day of Plaintiff's non-compliance constituted a new, discrete violation. As the charges at issue covered only the preceding five years of violations, and did not charge Plaintiff for all violations going back to the initial date of non-compliance, the Court finds that the charges were not barred by the applicable five year statute of limitations.

The Court notes that the parties also raised the theory of continuing violations in response to the statute of limitations. As the Court was able to address the statute of limitations issue on other grounds, it need not reach the issue of whether the violations at issue were continuing in nature.

D.    Denial of Plaintiff's Motion to Suppress

Plaintiff next raises the issue of whether the ALJ erred in denying Plaintiff's motion

to suppress.  Plaintiff contends that all evidence obtained from the searches conducted by the

EPA and TDEC should have been suppressed, because the searches were warrantless,

without consent, and thus unconstitutional.  Defendants disagree, arguing that any searches

of Tanks AV#1, AV#2, and AV#3 were authorized under the regulations, and that Plaintiff

consented to the search of November 28, 2000.  An ALJ's decision regarding the exclusion,

or inclusion, of evidence is reviewed for abuse of discretion.  *Kentucky River Community*

*Care, Inc. v. National Labor Relations Board*, 193 F.3d 444, 452 (6th Cir. 1999).

In addressing the suppression issue, the Court must also determine whether Tanks

AV#1 and AV#2 were farm tanks.  RCRA defines USTs as follows:

> The term "underground storage tank" means any one or
> combination of tanks (including underground pipes connected
> thereto) which is used to contain an accumulation of regulated
> substances, and the volume of which (including the volume of
> the underground pipes connected thereto) is 10 per centum or
> more beneath the surface of the ground. Such term does not
> include any–
>
> (A) farm or residential tank of 1,100 gallons or less capacity
> used for storing motor fuel for noncommercial purposes.

42 USCS § 6991(10)(A).  Thus, if Tanks AV#1 and AV#2 were farm tanks, then they would

not be considered USTs and would fall outside the regulations at issue in this matter.

Plaintiff contends that Tanks AV#1 and AV#2 were farm tanks.  Specifically, Plaintiff

contends that as the fuel contained in Tank AV#3 aged and became unfit for commercial use,

19

that he would transfer the fuel to one of these two farm tanks for non-commercial use by Plaintiff in relation to his farm activities. Additionally, Plaintiff argues that he used the other of the two smaller tanks as a "slop tank," siphoning off the water that would accumulate in the other tanks and storing it in the "slop tank."

Defendants contend that it is the EPA who must determine whether the tanks at issue were farm tanks, not Plaintiff, and thus, they were not bound by Plaintiff's assertions that Tanks AV#1 and AV#2 were farm tanks. The Seventh Circuit has addressed similar arguments and held that RCRA "vests broad authority in EPA to inspect and sample any facility at which the agency has probable cause to believe that violations of the statute are occurring." *National-Standard Co. v. Adamkus*, 881 F.2d 352, 361 (7th Cir. 1989). The *National-Standard* court rejected a narrow interpretation of the EPA's ability to inspect for hazardous waste under RCRA, holding that such an "interpretation would 'emasculate EPA's ability to pursue the broad remedial goals of RCRA.'" *Id.* at 360 (citation omitted). Thus, the Court finds that it is the EPA, not Plaintiff, who must make the determination of whether a UST qualifies as a farm tank.

The Court next notes that RCRA establishes that

> (a) Furnishing information. For the purposes of developing or assisting in the development of any regulation, conducting any study, taking any corrective action or enforcing the provisions of this subtitle, any owner or operator of an underground storage tank (or any tank subject to study under section 9009 that is used for storing regulated substances) shall, upon request of any officer, employee or representative of the Environmental Protection Agency, duly designated by the Administrator, or upon request of any duly designated officer, employee, or

20

representative of a State acting pursuant to subsection (h)(7) of section 9003 or with an approved program, furnish information relating to such tanks, their associated equipment, their contents, conduct monitoring or testing, permit such officer at all reasonable times to have access to, and to copy all records relating to such tanks and permit such officer to have access for corrective action. For the purposes of developing or assisting in the development of any regulation, conducting any study, taking corrective action, or enforcing the provisions of this subtitle, such officers, employees, or representatives are authorized--

    (1) to enter at reasonable times any establishment or other place where an underground storage tank is located;

    (2) to inspect and obtain samples from any person of any regulated substances contained in such tank;

    (3) to conduct monitoring or testing of the tanks, associated equipment, contents, or surrounding soils, air, surface water or ground water; and

    (4) to take corrective action.

Each such inspection shall be commenced and completed with reasonable promptness.

42 U.S.C. § 6991d(a). Thus, under RCRA, the EPA is authorized to conduct warrantless searches of a UST without the consent of the UST's owner. Accordingly, the Court finds that any search and seizure of Tank AV#3 was authorized under 42 U.S.C. § 6991d(a). Additionally, given the EPA's need to be able to investigate Tanks AV#1 and AV#2 to determine whether the tanks in question were farm tanks, the Court finds that the EPA was also authorized to inspect tanks AV#1 and AV#2. Thus, all searches of Tanks AV#1, AV#2, and AV#3 were authorized administrative searches under RCRA and were not unconstitutional.

With respect to the November 28, 2000, search, which included a search of various outbuildings and equipment, as well as a search of Tanks AV#1, AV#2, and AV#3, the ALJ found that there was voluntary consent to search, and that the government agents did not exceed the scope of the search. [TR Vol. 8, Tab 54 at p. 17.] The ALJ further found that the search of the outbuildings and equipment was necessary to determine whether Tanks AV#1 and AV#2 were subject to the farm tank exemption. [*Id.*] Plaintiff contends that any consent he gave was coerced, and that the felt intimidated by the presence of so many government agents. The ALJ, however, found Plaintiff to be incredible, and instead relied upon the evidence presented by Plaintiff's contractor, Mr. Miller, and other agents who conducted the search. [*Id.* at pp. 19-23.]

Additionally, the EAB noted in its opinion that Plaintiff had advance notice of the search; that Plaintiff did not object to any portion of the search; that Mr. Miller accompanied the agents throughout the search; that Plaintiff joined some of the agents in one of the hangars on the Property to answer questions regarding a drum of pesticide; and that Mr. Miller warned Plaintiff that if he claimed that Tanks AV#1 and AV#2 were farm tanks that the EPA would have to investigate his farm equipment and facilities to determine whether the farm exemption applied. [TR Vol. 8, Tab 61 at pp. 24-25.] The EAB further noted that

> It is a well settled principle of criminal law that where a search is conducted pursuant to consent there is no requirement that a search warrant be obtained. *Schneckloth v. Bustamonte*, 421 U.S. 218 (1973), *citing Davis v. U.S.*, 328 U.S. 582, 593-594; *Zap v. U.S.*, 328 U.S. 624, 630. It is equally well settled that where a defendant does not place any explicit limitations on his consent to a general request for a search, that is evidence of his

22

consent to all aspects of the search. *U.S. v. Mendoza-Gonzalez*, 318 F.3d 663, 667 (2003). In *Mendoza-Gonzalez* the Supreme Court reiterated the rule that the defendant has the responsibility to limit the scope of his consent to a search if that is what he desires to do. And where a defendant is present and does not object to the additional portions of a search as they are being conducted, that failure to object is evidence that the entire scope of the search has been consented to. *Id. citing U.S. v. McSween*, 53 F.3d 684, 688 (5th Cir. 1995); *U.S. v. Cannon*, 29 F.3d 472, 477 (9th Cir. 1994).

[TR Vol. 8, Tab 61 at p. 27.]

The United States Supreme Court has held that the "standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness -- what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (U.S. 1991). Given the record in this matter, the Court finds that the ALJ did not err in finding that Plaintiff had consented to the search. Additionally, the Court does not find that it was unreasonable for the agents executing the search to believe that they were acting within the scope of the consent they had received. Thus, the ALJ did not err in finding that the agents had not exceeded the scope of consent in conducting the November 28, 2000, search. Accordingly, the Court finds that the searches at issue were all constitutional, and thus the ALJ did not err in denying Plaintiff's motion to suppress.

Given that the searches were constitutional, and the evidence thus admissible, the Court further finds that the ALJ did not err in finding that Tanks AV#1 and AV#2 were not farm tanks. The evidence presented at trial did not support Plaintiff's contention that he used

the fuel from Tank AV#2 to fuel his farm equipment. The EAB summarized the relevant

evidence as follows:

> the harvesting of hay at [Plaintiff's] airport is merely a footnote to his operation of Powell Airport which has a long history as a busy commercial enterprise. [Plaintiff] allowed others onto his property to mow the hay, bale it, and take it away in exchange for a small payment. [Plaintiff] benefitted from this arrangement because it enabled him to keep Powell Airport groomed and well maintained at no cost to him. [Plaintiff] testified at length regarding the use of his property. The facts that came to light during his testimony follow.

> In 1949 [Plaintiff's] father owned the property where Powell Airport is located, at which time [Plaintiff] moved onto the property. [Plaintiff] got his pilot's license and built the runway at Powell Airport in 1951. [Plaintiff] has earned money operating Powell Airport and charging other aircraft for landing, aviation fuel purchases, and rental of hangar space, as well as by offering services like flight training, charter flights, and plane rentals, as all fixed based airport operators do. [Plaintiff] is a pilot by vocation. [Plaintiff] has an air taxi certificate which enables him to operate an air taxi service out of Powell Airport. [Plaintiff] operated an air taxi service primarily hauling car parts from local manufacturers to assembly plants located in Michigan or elsewhere in the U.S. When [Plaintiff] was busy he had as many as eight full-time flight instructors at Powell Airport, and about twelve planes available for rental purposes. At one time, everyone who learned to fly in Knoxville learned to fly at Powell Airport. [Plaintiff] has a Tennessee state license to operate Powell Airport. [Plaintiff] has not been employed by any outside employer for at least the past seventeen years. Additionally, [Plaintiff] has a large billboard on his property, visible from the nearby interstate, that advertises the services available at Powell Airport; his stationary says "Powell Airport" and lists the services offered at the airport, namely "aircraft charter," "aerial advertising," and "aerial photography;" and [Plaintiff] advertises Powell Airport in the county yellow pages.

> While [Plaintiff] has a tobacco allotment enabling him to grow tobacco on his property, [Plaintiff] has never actually used his allotment. Instead, he has sold his allotment each year to, in his words, "a farm that doesn't have an airport on it."
>
> Demonstrating that [Plaintiff's] sale of hay was merely a footnote to his airport operation is the fact that [Plaintiff] earned only about $1,000 per year from sales of hay in any given year that he sold hay. The primary reason he allowed hay to be harvested on his property was to maintain his airport, and for aircraft safety.
>
> Tank #1 and tank#2 were not located on "farm" property since [Plaintiff's] property was not used as a farm. In fact, tank #1 and tank #2 were not even located in the fields on [Plaintiff's] property where has been cut and baled. Instead tank #1 and tank #2 were located beneath the paved tarmac on Powell Airport where the aviation fuel pumps were located. For the foregoing reasons it is clear that the [ALJ] correctly found that tank #1 and tank #2 were not exempt "farm tanks." Instead they were regulated USTs.

[TR Vol. 8, Tab 61 at pp.32-33 (citations omitted).] Given the record before the Court, the Court agrees with the ALJ's and the EAB's analysis. All of the evidence before the Court argues that the "farm" activity of the Property was incidental to its true purpose, being used as an airport. Accordingly, the Court finds that the ALJ did not err in ruling that tanks AV#1 and AV#2 were not "farm tanks" because they were not located on a tract of land devoted to the production of crops.

E.    Plaintiff's Credibility

Plaintiff next contends that the ALJ erred by finding Plaintiff's testimony incredible. The Sixth Circuit has held that an ALJ's determinations of credibility are to be given great weight and deference, "particularly since the ALJ has the opportunity, which [the reviewing

court does] not, of observing a witness's demeanor while testifying." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). Instead, the reviewing court must determine whether the "ALJ's explanations for . . . discrediting [the claimant] are reasonable and supported by substantial evidence in the record." *Id.*

The ALJ dedicated approximately four and a half pages of the opinion to the subject of Plaintiff's credibility. [TR Vol 8, Tab 54 at pp. 19-23.] One of the issues raised by the ALJ is the issue of whether Tank AV#3 was converted to a container of pesticide rather than aviation fuel. The Court notes, as described in the Relevant Facts section in more detail, that the issue of the change in use of Tank AV#3 arose in conjunction with Plaintiff's unpaid registration fees as to Tank AV#3, unpaid fees which were forgiven when TDEC was informed that the tank had gone through a change in use. The ALJ also focused on Plaintiff's repeated statements that Tank AV#3 was empty since about June 1997 [TR Vol 1, Tab 2 at ¶ 25 ("tank AV#3 has been empty since 1997"); Tab 13-13("have not had any product in [the tank] for two (2) years or longer"); Tab 13-16 ("have not had fuel in the tank since 1997.")], even though there was evidence that Tank AV#3 did contain fuel.

The ALJ also took note of the confusion over when Tanks AV#1, AV#2, and AV#3 came into service. Included with Plaintiff's response to the EPA's request for information was a typewritten document indicating that the tanks all had a date of ownership of 1987. [TR Vol 1, Tab 13-25 at p. 2.] However, Plaintiff denied submitting that page, claiming to have no idea where it had come from. In his initial answer to the complaint, Plaintiff stated: "Admit that the Respondent does not know the date of installation for the two 1,000 gallon

26

capacity tanks identified as AV#1 and AV#2. Respondent denies that both tanks AV#1 and AV#2 were in the ground at the time the Respondent came to own the facility in 1987, since Respondent came to own the facility in 1966." [TR Vol. 1, Tab 2 at ¶ 17.] The stipulations agreed to by the parties also demonstrated that Plaintiff owned the airport since 1966. [TR Vol 3, Tab 35 at ¶ 3.] The ALJ found it incredible that Plaintiff would argue that he had not submitted the document indicating the 1987 ownership dates, even though it was included with other documents that Plaintiff had submitted.

Given the record in this matter, the Court does not find the ALJ's determination that the Plaintiff's testimony was incredible to be unreasonable. Despite Plaintiff's attempts to explain the discontinuity, the Court finds that there is substantial evidence to support the ALJ's credibility determination. Accordingly, the ALJ did not err in finding Plaintiff's testimony to be incredible.

F.    Liability

Plaintiff next addresses the issue of whether the ALJ erred in finding Plaintiff liable for the charged violations. The Court will address each charged count in turn.

1.    Count One - Failure to Submit Notice of Existence of Tanks AV#1 and AV#2

In the first count, the ALJ found Plaintiff liable for a violation of Section 9003 of RCRA and 40 C.F.R. § 280.22 for failure to submit a notice within thirty days of bringing Tanks AV#1 and AV#2 into use. [TR Vol. 8, Tab 54 at p. 23.] Plaintiff contends that the ALJ erred, arguing that Tanks AV#1 and AV#2 were farm tanks, and thus exempt from the regulations. The Court addressed the farm tank issue above, finding that the ALJ did not err

27

in finding that Tanks AV#1 and AV#2 were USTs, not farm tanks. Additionally, the Court finds that substantial evidence supports the ALJ's findings with regard to count one. Accordingly, the ALJ did not err in finding Plaintiff liable in count one for a violation of Section 9003 of RCRA and 40 C.F.R. § 280.22 for failure to submit a notice within thirty days of bringing Tanks AV#1 and AV#2 into use.

 2. <u>Count Two - Failure to Provide Release Detection for Tanks AV#1 and AV#2</u>

In the second count, the ALJ found Plaintiff liable for a violation of 40 C.F.R. § 280.40 for failure to comply with the UST system release detection requirements for Tanks AV#1 and AV#2. Plaintiff contends that the ALJ erred because the tanks are farm tanks and because the tanks are "empty," as the term is defined in 40 C.F.R. § 280.70, and thus release detection was not required. The Court addressed the farm tank argument above, so the Court will focus on Plaintiff's "empty" tank argument.

In establishing release detection for USTs, federal regulations state, in pertinent part, that:

> (a) Owners and operators of new and existing UST systems must provide a method, or combination of methods, of release detection that:
>
> (1) Can detect a release from any portion of the tank and the connected underground piping that routinely contains product;
>
> (2) Is installed, calibrated, operated, and maintained in accordance with the manufacturer's instructions, including routine maintenance and service checks for operability or running condition; and

> (3) Meets the performance requirements in § 280.43 or 280.44,
> with any performance claims and their manner of determination
> described in writing by the equipment manufacturer or installer.

40 C.F.R. § 280.40(a). The regulations also establish a schedule for compliance with the release detection requirements, with the latest possible date for compliance being for tanks brought into existence between 1980 and 1988, which were required to have been brought into compliance no later than December 22, 1993. 40 C.F.R. § 280.40(c). The regulations also provide that:

> When an UST system is temporarily closed, owners and operators must continue operation and maintenance of corrosion protection in accordance with § 280.31, and any release detection in accordance with subpart D. Subparts E and F must be complied with if a release is suspected or confirmed. However, release detection is not required as long as the UST system is empty. The UST system is empty when all materials have been removed using commonly employed practices so that no more than 2.5 centimeters (one inch) of residue, or 0.3 percent by weight of the total capacity of the UST system, remain in the system.

40 C.F.R. § 280.70(a).

Plaintiff contends that, based upon the language of 40 C.F.R. § 280.70(a) governing empty USTs, that Tanks AV#1 and AV#2 did not require release detection because those tanks were empty under the second definition of empty, that of percent by weight. Plaintiff contends that Defendants presented no evidence to show that the tanks in question were not empty under the percent by weight portion of the definition, and thus argues that the tanks are "empty." Plaintiff further argues that because the tanks are "empty," the third sentence of 40 C.F.R. § 280.70(a) exempts the "empty" tanks from the release detection requirements.

29

In interpreting statutes, or, in this case, regulations, as the EAB noted, the United States Supreme Court has held that a cardinal rule of statutory construction is that a statute is to be read as a whole. *King v. St. Vincent's Hospital*, 502 U.S. 215, 221 (1991). Read as a whole, 40 C.F.R. § 280.70(a) indicates that when a tank is in temporary closure, release detection is required unless the tank is "empty." The fact that 40 C.F.R. § 280.70(a) begins with the phrase "When an UST system is temporarily closed" and that the portion discussing "empty" tanks begins with the word "However," indicates to the Court that the portion of the regulation in question is establishing an exception to the immediately preceding section, which relates only to tanks in temporary closure. Had the drafters wished to exclude all "empty" tanks from the release detection requirements, they would have included such an exception in the release detection regulation itself, or in its own regulation, they would not have placed the exception in the middle of a regulation regarding the temporary closure of tanks.

Accordingly, the Court finds that the "empty" provision of 40 C.F.R. § 280.70(a) applies only to tanks in temporary closure. Tanks AV#1 and AV#2 were not in temporary closure, thus it is irrelevant whether the tanks were "empty." Plaintiff does not otherwise dispute that he did not provide release detection for Tanks AV#1 and AV#2. Thus, the Court finds that the ALJ's finding that Plaintiff was liable for count two is supported by substantial evidence.

### 3. Count Three - Failure to Provide Release Detection for Tank AV#3

In the third count, the ALJ found Plaintiff liable for a violation of 40 C.F.R. § 280.40 for failure to comply with the UST system release detection requirements for Tank AV#3. With respect to count three, Plaintiff again contends that Tank AV#3 was "empty" under 40 C.F.R. § 280.70(a), and thus release detection was not required. Plaintiff contends that Tank AV#3 was never placed in temporary closure. Accordingly, for the reasons discussed above, Plaintiff's argument must fail. Therefore the Court finds that the ALJ's finding that Plaintiff was liable for count three is supported by substantial evidence.

### 4. Count Four - Failure to Upgrade or Permanently Close Tanks AV#1 and AV#2

In the fourth count, the ALJ found Plaintiff liable for a violation of 40 C.F.R. § 280.21 for failing to upgrade or permanently close Tanks AV#1 and AV#2 prior to the December 22, 1998 deadline. Plaintiff's only argument with respect to count four is that Tanks AV#1 and AV#2 are farm tanks, and thus fall outside the regulations. The Court has already ruled that Tanks AV#1 and AV#2 are not farm tanks, and thus the regulations do apply. Accordingly, the Court finds that the ALJ's finding that Plaintiff was liable for count four is supported by substantial evidence.

### 5. Count Five - Failure to Upgrade or Permanently Close Tank AV#3

In the fifth count, Plaintiff was charged with failing to permanently close Tank AV#3 and assess the site for releases after twelve months of temporary closure as required by 40 C.F.R. § 280.70(c). However, based upon Plaintiff's arguments that Tank AV#3 was never temporarily closed, the ALJ *sua sponte* amended count five to charge Plaintiff with failing

to upgrade or permanently close Tank AV#3 in violation of 40 C.F.R. § 280.21, the same charge Plaintiff faced in count four with respect to Tanks AV#1 and AV#2. The ALJ then found Plaintiff liable for the amended count five.

Plaintiff contends that the ALJ erred by amending the complaint at that point in the litigation, and further erred by finding Plaintiff liable for a violation for which he was never charged. The Court notes that this is the first time Plaintiff has raised this issue, having failed to raise it before the EAB. To the extent that Plaintiff claims that his due process rights were violated by the ALJ's actions, those arguments are deemed waived by Plaintiff's failure to raise them below. *Hix v. OWCP*, 824 F.2d 527 (6th Cir. 1987) ("even if a claimant properly appeals some issues to the EAB, the claimant may not obtain review of the ALJ's decision on any issue not properly raised before the Board."). Plaintiff also argues that the ALJ acted outside her authority, thus rendering her decision void *ab initio*. While Plaintiff did not raise this argument below, in an abundance of caution, the Court addresses that issue herein.

Plaintiff contends that the ALJ acted outside her authority by *sua sponte* amending the administrative complaint against. Plaintiff offers no legal authority in support of his argument that the ALJ acted outside her authority. In researching the issue, the Court encountered two decisions addressing similar issues.

In the case of *New York State Elec. and Gas Corp. v. Sec'y of Labor*, 88 F.3d 98 (2d Cir. 1996), the Second Circuit addressed the issue of whether the Occupational Health and Safety Review Commission ("Commission") erred in *sua sponte* amending an administrative complaint. In that case, the Secretary of Labor charged the respondent with a violation of

32

29 C.F.R. § 1926.28 and 29 C.F.R. § 1926.102(a)(1).[3] *New York State Elec. and Gas Corp.*, 88 F.3d at 101. The Secretary subsequently amended the citation, charging respondent with a violation of 29 C.F.R. § 1910.132(a) and 29 U.S.C. § 654(a)(1).[4] *New York State Elec. and Gas Corp.*, 88 F.3d at 101. At a hearing, the ALJ found the respondent liable for the amended charges. *Id.* at 102. On appeal, the Commission ruled that the charges based upon the general duty clause contained in 29 U.S.C. § 654(a)(1) were not appropriate, holding that the general duty clause could not form the basis of the action if there was a specific regulation covering the offense. *New York State Elec. and Gas Corp.*, 88 F.3d at 102. The Commission ruled that the original charge of 29 C.F.R. § 1926.28(a) was the appropriate charge and *sua sponte* amended the complaint to reinstate that charge. *New York State Elec. and Gas Corp.*, 88 F.3d at 102. The Second Circuit affirmed in part and reversed in part. *Id.* at 103.

In addressing the *sua sponte* amendment, the Second Circuit ruled that:

> The question is whether the Commission should have dismissed, rather than amended, that part of the complaint alleging a violation of the Act's general duty clause stemming from Price's

---

[3] 29 C.F.R. § 1926.28 makes employers "responsible for requiring the wearing of appropriate personal protective equipment in all operations where there is an exposure to hazardous conditions or where this part indicates a need for using such equipment to reduce the hazards to the employees." *Id.* 29 C.F.R. § 1926.102(a)(1) requires employees be provided with protective gear for their eyes and face when the possibility of eye or face injury exists. *Id.*

[4] 29 C.F.R. § 1910.132(a) requires the use of "protective equipment, including personal protective equipment for eyes, face, head, and extremities . . . wherever it is necessary by reason of hazards . . . encountered in a manner capable of causing injury." *Id.* 29 U.S.C. § 654(a)(1) is the general duty clause of OSHA, requiring employers to comply with OSHA and to provide employees with a hazard free work environment. *Id.*

failure to use protective eyewear. The Commission adopted petitioner's contention that the general duty clause was an inappropriate basis for the citation because a specific standard -- 29 C.F.R. § 1926.28, the standard invoked in the original citation -- applied to Price's conduct. But instead of dismissing, the Commission proceeded to amend the complaint itself, reading the complaint as though it had asserted a special duty clause violation. Petitioner believes such *sua sponte* amendment was error.

Proceedings before the Commission generally are governed by the Federal Rules of Civil Procedure. 29 U.S.C. § 661(g). Under the Federal Rules, pleadings are not ends in themselves, but are simply the means by which a case is presented to a tribunal. *See Usery v. Marquette Cement Mfg. Co.*, 568 F.2d 902, 906 (2d Cir. 1977). In an administrative proceeding, which of course is the forum for the instant case, pleadings are liberally construed and easily amended. *Id.* And, because such matters are conducted informally, the form a pleading takes does not loom large, *see* 1 Kenneth C. Davis, Administrative Law Treatise § 8.04, at 523 (1st ed. 1958) (administrative pleadings are unimportant). Further, under Fed. R. Civ. P. 15(b), "when issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." In assessing whether the pleadings should conform to the proof, the pivotal question is whether prejudice would result. *See Marquette Cement*, 568 F.2d at 907.

*New York State Elec. and Gas Corp.*, 88 F.3d at 104. The Second Circuit also noted that

"[t]he fact that a Rule 15(b) amendment involves a change in the nature of the cause of

action, or the legal theory of the action, is immaterial so long as the opposing party has not

been prejudiced in presenting its case." *Id.* at 105 (quoting *D. Federico Co. v. New Bedford

Redevelopment Auth.*, 723 F.2d 122, 126 (1st Cir. 1983). The Second Circuit further held

that "[n]or is it helpful to the employer that the Secretary failed to move to amend because

34

Rule 15(b) requires no motion or formal amendment of the pleadings." *Id.* (citing *Howell v. Cataldi*, 464 F.2d 272, 275 (3d Cir. 1972) (under Rule 15(b), court "looks beyond the pleadings"). The Second Circuit held that the Commission acted appropriately in *sua sponte* amending the complaint and that the employer had not been prejudiced. *Id.*

Similarly, in the case of *Halvonik v. Dudas*, 398 F. Supp. 2d 115 (D.D.C. 2005), the United States District Court for the District of Columbia addressed the issue of whether an ALJ erred by *sua sponte* amending a complaint in an administrative proceeding. *Id.* at 116. *Halvonik* involved a disciplinary hearing for attorney misconduct before the Patent and Trademark Office. *Id.* The ALJ found the attorney liable for "neglectfully failing to timely follow-up and review the PTO files as [the client] requested to determine if the file contained the draft rather than the final copy of the application and/or make any necessary corrections," although a charge of neglect was not specifically noticed in the charge. *Id.* at 126. In so ruling, the ALJ held that the respondent had been sufficiently put on notice by the complaint's references to the respondent's "gross misconduct" and "neglect." *Id.*

In summarizing the issue, the *Halvonik* court stated that "[t]he gravamen of this part of Halvonik's challenge is whether a proposition that is not specifically rehearsed in the Complaint, but falls within the ambit of the general charges, constitutes a 'new charge' that prejudiced the defendant." *Id.* The court ruled that Halvonik had been put on notice and that Halvonik had not been prejudiced. *Id.* at 126-7.

The Court finds these two cases to be persuasive and adopts their reasoning herein. Accordingly, the Court must determine whether Plaintiff was prejudiced by the ALJ's

amendment of the complaint.  In the instant case, Plaintiff was initially charged with a violation of 40 C.F.R. § 280.70(c) with respect to Tank AV#3, but the ALJ *sua sponte* amended the complaint to charge Plaintiff with a violation of 40 C.F.R. § 280.21 with respect to Tank AV#3.  In so doing, the ALJ, citing to Rule 15 of the Federal Rules of Civil Procedure, held that Plaintiff was not prejudiced by such an amendment because he had been put on notice of the requirements of 40 C.F.R. § 280.21 in count four, though that count addressed only Tanks AV#1 and AV#2.  [TR Vol 8, Tab 54 at p. 39 n. 34.]  Thus, it is clear that Plaintiff was aware of the regulations at issue.

The Court also notes that the EAB addressed the issue of whether Plaintiff was prejudiced by the ALJ's actions, even though Plaintiff did not raise that issue before the EAB.  [TR Vol 8, Tab 65 at p. 55.]  In analyzing the issue, the EAB stated that:

> In the instant case, we note that the evidence necessary to establish a 40 C.F.R. § 280.70(c) violation differs from that required to prove a 40 C.F.R. § 280.21 violation primarily on the basis of the twelve months of temporary closure requirement of the former provision.  Both regulations mandate closure or upgrading of existing UST systems, liability may be proven by showing failures to perform these actions.  At the hearing and in briefs submitted to the ALJ, the parties had full opportunity to litigate these various issues. *See, e.g.*, Init. Dec. at 19-23, 31-34, 36-39. Importantly, Mr. Mayes did not dispute that he had not upgraded or closed Tank #3 prior to the December 22, 1998 deadline specified in 40 C.F.R. 280.21 for existing USTs, and he does not now dispute those points on appeal.  Moreover, the administrative record is replete with the diverse array of conflicting statements from Mr. Mayes regarding the status of Tank #3, which support the ALJ's determination that [the EPA] was misled by these statements in drafting the Complaint.  In these circumstances, we affirm the ALJ's finding that Mr. Mayes did not suffer prejudice as a result of her exercise of

> discretion in amending the Complaint to conform it to the evidence. We accordingly affirm the ALJ's decision to hold Mr. Mayes liable for a violation of 40 C.F.R. § 280.21 with respect to Tank #3.

[TR Vol 8, Tab 64 at p. 56-57.] Additionally, the Court notes that Plaintiff has offered no arguments to dispute the ALJ's and the EAB's finding that he was not prejudiced by the ALJ's actions.

Given that the Court has already found that the ALJ did not err in finding Plaintiff's testimony incredible, given the conflicting information in the record as to the status of Tank AV#3, given the similar nature of the proof required between the original charge and the amended charge, and given Plaintiff's failure to show in any way how he was prejudiced by the ALJ's actions, the Court finds that the ALJ did not err in finding that Plaintiff would not be prejudiced in amending the complaint to conform to the evidence. Accordingly, the Court finds that the ALJ acted within her authority under Rule 15 of the Federal Rules of Civil Procedure, and thus her action was not void *ab initio*. Therefore, the Court rules that the ALJ's decision finding Plaintiff liable for a violation for 40 C.F.R. § 280.21 is supported by substantial evidence. Additionally, as the Court noted above, Plaintiff did not raise the issue of the *sua sponte* amendment before the EAB, and thus has waived the issue on further appeal.

G.    Penalty Calculations

Plaintiff next addresses the issue of the penalties assessed in this matter, contending that the penalties are random and subjective, and thus the penalty assessment should be

reversed. Defendants disagree, arguing that the penalty determination was supported by substantial evidence. In addressing this issue, the Court must pay particular deference when reviewing an agency's imposition of a penalty or other sanction because such action implicates an agency's technical expertise. *Newell Recycling Co., Inc. v. EPA*, 231 F.3d 204, 208 (5th Cir. 2000). Accordingly, an agency's penalty determination should not be reversed unless it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. *Id.*

Plaintiff contends that the penalty calculation in this matter was completely subjective and that Plaintiff should have been rewarded for the cooperation he provided in this matter. Defendants disagree, arguing that Plaintiff's cooperation after the fact should not be rewarded, and also questioning how cooperating Plaintiff actually was.

In discussing the assessment of a penalty, the ALJ made the following observations:

> the record strongly indicates that a release or releases from the UST systems in question occurred at the [Property]. Respondent's assertion that the contamination discovered at the site could have originated at an abandoned gasoline station across the street from the [Property] or at two gasoline stations adjacent to the [Property] is plausible. However, more than likely, the releases came from one or more of the UST systems at the facility. In this regard, I note that there were holes in two of Respondent's tanks when the tanks were excavated. Mr. Burton from the EPA detected odors of gasoline vapors in the excavation area and observed a sheen on the surface of the water in the excavation pits. Petroleum staining was observed in the soil samples collected in the excavation pits. Finally, I observe that the removed USTs at the facility were closest to the sampled areas of contamination, and there was no evidence of leaking tanks on the other sites.

38

Respondent argues that the penalty calculation is highly subjective and that Respondent should have been given a downward adjustment to the penalty calculation for his cooperation and good faith effort to comply. Respondent asserts that one of the adjustment factors was for cooperation which could have been adjusted plus or minus 25%, yet was not adjusted for Respondent's cooperation. Respondent points to the testimony of Mr. Ryan Hyers, who agreed that Respondent was cooperative in complying with the clean-up directives. Respondent also argues that his cooperative behavior, such as hiring contractors to remove the tanks from his property, submitting removal and abatement reports, and installing monitoring wells, should be reflected in a downward adjustment to the matrix value. Moreover, Respondent contends that he supplied a number of documents to the EPA in an effort to explain his situation of his own free will and volition.

Complainant's witness, Mr. Hyers, testified that Respondent's "cooperativeness" was the minimum requirement imposed on all tank owners rather than actions worthy of a matrix value reduction.

I find that Complainant appropriately did not adjust downward the matrix value to reflect Respondent's actions and conduct. The UST Penalty Policy explains that:

> In order to have the matrix value reduced, the owner/operator must demonstrate cooperative behavior by going beyond what is minimally required to comply with requirements that are closely related to the initial harm addressed. For example, an owner/operator may indicate a willingness to establish an environmental auditing program to check compliance at other UST facilities, if appropriate, or may demonstrate efforts to accelerate compliance with other UST regulations for which the phase-in deadline has not yet passed. Because compliance with the regulations is expected from the regulated community, no downward adjustment may be made if the good faith efforts to comply primarily

consist of coming into compliance. That is, there should be no 'reward' for doing now what should have been done in the first place. On the other hand, lack of cooperation with enforcement officials can result in an increase of up to 50 percent of the matrix value.

Respondent's activities were only the minimal requirements necessary to finally come into compliance with the UST regulations. Respondent's acts of sending in explanatory materials to the EPA were not above and beyond what was necessary to state his case. Furthermore, Respondent's adherence to clean-up directives clearly does not constitute cooperative behavior to merit a reduction and would be, in fact, a reward for doing now what should have been done by him.

[TR Vol 8, Tab 54 at pp. 48-49 (citations omitted).]

Similarly, the EAB addressed Plaintiff's penalty arguments as follows:

Lastly, Mr. Mayes submits a number of largely conclusory arguments pertaining to the penalty calculation in this case. In so doing, Mr. Mayes raises no challenges of any kind to the ALJ's analysis of the penalty. Rather, he argues simply that [the EPA] calculated the proposed penalty arbitrarily and unfairly by refusing to grant penalty deductions on the basis of his cooperation, lack of willful violations, absence of prior noncompliance, and other unique factors. he also argues that EPA's RCRA section 9006 penalty guidelines are "random and subjective" and thus no penalty should be assessed against him.

Under the Consolidated Rules of Practice that govern this proceeding, a presiding officer is responsible for assessing a penalty based on the evidence in the record and the penalty criteria set forth in the relevant statute, and also considering any civil penalty guidelines issued by EPA under the statute. The presiding officer must "explain in detail in the initial decision how the penalty to be assessed corresponds to any penalty criteria" set forth in the statute. In cases where a presiding officer has provided a reasonable explanation for the penalty assessment and the assessed amount falls within the broad range

> of penalties provided in the penalty guidelines, the Board generally will not substitute its judgment for that of the presiding officer absent a showing that the presiding officer committed a clear error or an abuse of discretion in assessing the penalty.
>
> In this case, the ALJ prepared a reasonable explanation of her penalty assessment, and the assessed penalty falls within the range of penalties provided in the RCRA section 9006 penalty guidelines. There has been no showing by Mr. Mayes of clear error or abuse of discretion in the ALJ's analysis in this regard. We therefore defer to the ALJ's determination of the appropriate penalty in this case.

[TR Vol 8, Tab 64 at pp. 57-58 (citation omitted).]

Plaintiff's arguments before this Court as to the penalty mirror those before the EAB. Plaintiff merely argues again that he should have been rewarded for his cooperation and absence of a prior history of violations, and that the EPA's failure to do so renders the penalty random and subjective. However, as the ALJ noted, the penalty guidelines only recognize cooperative behavior that goes above and beyond what a UST owner would need to do to come into compliance with the regulations. The guidelines further note that "there should be no 'reward' for doing now what should have been done in the first place." In his "cooperation," Plaintiff has done just that, having brought his facility into compliance with the regulations after the fact. There is no evidence that Plaintiff has gone "above and beyond," and thus, the Court does not find that Plaintiff's actions were so exceptional that they deserved a reduction in the penalty amount.

Further, while Plaintiff was not granted a reduction in penalty, nor was Plaintiff penalized for a failure to cooperate. The evidence shows that Plaintiff gave the level of

cooperation expected of all UST owners, and thus he was neither penalized nor rewarded. The Court cannot find such action to be arbitrary and capricious. Accordingly, the Court finds that the ALJ did not err in approving the penalty calculation in this matter.

      H.    <u>Plaintiff's Defenses</u>

Plaintiff also argues that Defendants did not carry their burden because Plaintiff established several defenses at trial which Plaintiff contends Defendants could not refute. Given that the Court has addressed each of Plaintiff's defenses above, the Court need not address this argument further. For the reasons discussed above, Plaintiff's defenses all fail, and thus the ALJ did not err in finding that Defendants had carried their burden.

## IV.    Conclusion

For the reasons stated more fully above, the Plaintiff's motion for judgment on the record [Doc. 35] will be **DENIED**; the Defendants' motion for judgment on the record [Doc. 36] will be **GRANTED**; the EAB's decision will be **AFFIRMED**; and this case will be **DISMISSED**. An Order reflecting this opinion will be entered.


            s/ Thomas A. Varlan
            UNITED STATES DISTRICT JUDGE